Good morning, Your Honors. May it please the Court. My name is George Chalas, and I appear on behalf of the appellants. Oceanic Illsabe and Ocean Fleet Shipping Limited. And here my presence is to amplify the briefing as to why the vicarious convictions of the two organizational defendants was in error, and why Judge Howard at the District Court was in error for denying the organizational defendants Rule 29 motion for acquittal, judgment by acquittal. To understand the story, we have to visit just a moment about the players and the parties. Oceanic Illsabe is the company that owned a ship called the Ocean Hope. Oceanic Illsabe had one income earning asset, the vessel. And Oceanic was the employer of the crew. The crew members were contractual employees who served for a few months. Then they would leave, and then if they would like to come back, they would go through their own manning agency, in this case based in Manila in the Philippines. When they were available to go to work and wanted to go to work, they would seek employment through their manning agency and see who was hiring. Ocean Fleet was a manager of the ship. And frankly, what is a manager? A manager in this case is akin to a school teacher. They were the ones who set the rules, they were the ones who helped train the crew, and they were the ones who helped source the crew. But in no uncertain terms, they were not the employer of any of the crew members. And so what happens on this ship? The ship is in international waters, flying the flag of a foreign sovereign with foreign crew members. Personnel of the ship wore shirts with the name on them. What was the name on the shirt? Well, Your Honor, you're asking about the boiler suits. The boiler suits had Ocean Fleet painted on it. But remember, they're a vendor to the ship owner. Now, the government in Ocean Fleet, so therefore, they must be the employee of Ocean Fleet. Now, the question of employer and employee is a contractual arrangement, not subject to someone's subjective belief. The fact that a vendor gives someone a suit as a present as part of the contractual arrangement between the ship owner and its contractual manager doesn't transform the raceway on the weekend. No one would say the guy driving the number 11 car, they had FedEx painted on the outside, and he and his pit crew wear FedEx uniforms, are FedEx employees. So that really is an evidence of the relationship. This is black letter law, contractual construction, who's the employer, who's the employee. But what's interesting in this case is some crew members are running a corrupt black market enterprise. We learned at trial for the first time that one of the tanks that was supposed to be used to store engine room wastes was in fact being used to store diesel fuel that they had sold, that they had stolen for sale on the black market. Now, what's important? This was totally unknown to the master of the ship, or the captain, the person in charge of the vessel. It was certainly unknown to the employer, Oceanic, and certainly unknown to Ocean Fleet, and all the people who had been on board the ship that included other coast guards, port state control authorities, flag inspectors, vetting inspectors, classification society inspectors, and a superintendent engineer and a port captain, both of whom rode the ship from Panama for eight days into Wilmington, North Carolina. What we know is that the misconduct was performed, and it's undisputed, for the crew's convenience. It was in furtherance of their black market corrupt stealing of fuel and sales. We know that the whistleblower, the third engineer, Mr. Minente, wanted to come forward, and he did come forward. He told his wife, hey, I'm going to report this, but I'm not going to report this to the company, either the ship owner or the ship manager. And he tells his wife in the text messages, don't tell the captain. If anyone calls you, don't tell them. And what's most egregious here is when Minente and his wife make contact with the U.S. government, they speak to a Coast Guard investigative service agent, Mr. Nguyen, and he tells them, don't tell your employer. Now, why is that important? Because the underlying conduct, the failure to maintain an accurate oil record book because of unrecorded discharges and movements of this waste, had the company, the employer, or the manager, or anyone else involved in this case known about it, they would have been able to take corrective measures. What are corrective measures? If those entries for those discharges had been placed in the book, there's no U.S. crime. The ship would not have sailed into the U.S. waters with a knowingly falsified oil record book. And that's agreed with the government. The crime isn't the discharging. The crime isn't anything that occurs outside of U.S. waters. It's limited by the Third Circuit's decision in U.S. behavior that it There's plenty of sites in the record that show that the crew members were all employees of Oceanic, not Ocean Fleet. But remember, there's no allegations of any misconduct by either company. What they're saying is the people on the ship were the bad actors, and companies can only act through the people on the ship. But where Judge Howard went wrong is he lumped the companies together. He didn't analyze the employer-employee relationship on a one-by-one basis. The conviction of Ocean Fleet is wrong. This is a complete lack of evidence. Did you make a request for charge that would require the jury to make that distinction? Yes, we did. What page is that on? I don't have the page, but we presented evidence, and we made an argument, and we asked the court for each company to be treated separately. In fact, they are separate and distinct companies. In fact, there was never any allegation of a single enterprise, because if there would have been such an allegation, then imposing punishment on each of the companies would be an impermissible double dip. Now what we're saying here is there's absolutely no evidence of an employment agreement between Ocean Fleet and the crew members, and there's no evidence of agency. We also say, when you look to Oceanic as employer, the deficiency falls in the government's failure to offer any evidence of intent. The court, I'm sure, is clear that in order for a company to be vicariously responsible for, criminally responsible for acts of agents or employees, it's a three-pronged test. That first, the individual is an agent or an employee, that the conduct is done in the course and scope of their authorized employment or agency. But the third, and here where I focus my attention, is that the conduct was done with the intention, at least in part, to benefit the company. There was a total failure in the government to present any evidence of the subjective intent of any of the crew members. In fact, the evidence that was presented was to the contrary, that they knew and acknowledged their training to follow the rules. They knew and acknowledged their training to report misconduct immediately. They knew and acknowledged that under their own Philippine Overseas Employment Agency union contract, the POEA arrangement, that they were only to follow legal orders and to refuse illegal orders. There was also evidence from the captain. Captain Tabaraccio said that no one reported any misconduct and despite his open door policy, had he known of any misconduct, he would have passed it on to the employer and would have expected remedial measures and possibly termination of the poorly acting crew members. But what's important here is the actual evidence that came from the people that were doing the bad stuff. The fourth engineer, Mr. Sarduma, testified it was secret. It was purposely hidden from the captain. Remember, that's the man in charge of the vessel. It was hidden from the port captain, the two gentlemen that rowed the ship for eight days prior to arrival in Wilmington. It was kept from the Panamanian authorities. Now, remember, this ship had come through the Panama Canal with dozens of people coming on board the vessel. Again, the misconduct was being hidden. It was being hidden from their own manning agency. Captain Spencer Yara came all the way from the Philippines and testified to that. But the whistleblower himself, Mr. Menente, he was the third engineer. His testimony was, well, we did it because it was easier. Now, that intent means it's for crew convenience, not for a benefit of either their employer, Oceanic, or the vessel's manager. And of course, you can't forget to look at the specific intent of the whistleblower telling his wife to keep this secret. Don't tell the captain. Don't tell the company. There was certainly looking at the charges specifically. There was no evidence of subjective intent for this conspiracy charge, count one, or lying to the agents or tampering with the witnesses. That covers counts four through nine. And when you look at the record book violations, count two, that's the apps count, which is an aiding and abetting theory, or the thousand and one violation. Again, no evidence of subjective intent. Now, I'd like to bring to the court's attention a novel argument. This area of law is evolving. That relates to count two, aiding and abetting. There's only two cases, two circuit court cases that talk about aiding and abetting under the Act to Prevent Pollution from Ships. They both come from the Fifth Circuit. That's the Joe case, JHO, and the Fafalios case. And Fafalios makes clear that an engineer can't be convicted of an apps violation because that title or role on a ship isn't the title or role on the ship that's responsible for keeping the record. It's only the captain. So here, in that case, Fafalios' conviction was overturned by the Fifth Circuit. So here, when you have a situation where the engineers can only be convicted of aiding and abetting, on a theory of aiding and abetting, and you have the master— Aiding and abetting is not an offense. Just a theory of offense. And you have the master, who's the company, the employers, man on the scene, totally in the dark. You can't have an aiding and abetting of yourself. Right? You can't have an aiding and abetting where the representative on board the ship is in the dark completely about the misconduct. And this is a knowing violation. So we say that it's improper as a matter of common sense and legal construction for a vicarious conviction of the companies on the theory of aiding and abetting when the person who has the liability, captain, doesn't know about the misconduct. Now, a few more final thoughts that we believe that if there is a conviction that should stand, that the court failed to count—the group counts two and three and counts six through nine—that that would effectively turn what's an 18-count case, if you look at both defendants together, into a 10-count case and substantially reduce the fine. If $100,000 is the right amount based on the district court's determination of the fine against Oceanic, the employer, that turns a $2.7 million fine into a $1 million fine pretty quickly. But we say that that's not right. This court should send the case back, should overturn the penalties imposed, the fines imposed, if it gets that far, for at least four reasons, any one of which is enough to set aside the punishment and send the case back. First off, it's unreasonable. It was well more than necessary, and Kimbrough tells us that the fine should be no more sufficient but no more than necessary. Judge Howard failed to consider the 3572 factors, 18 U.S. Code 3572 factors, and he failed to make any findings of the defendant's economic circumstances and ability to pay. Again, just lumped them together and relied on two PSRs which said, well, they could probably pay over time, but there was no analysis of any of the factors, specifically 3572, 1, 2, 3, and 8. We know that Oceanic had only one income earning asset. That was the vessel that was 20 years old and had come to the end of its useful life and had been scrapped, sold and scrapped before the end of this case. In U.S. v. Hill, this court told us that a sentence should be vacated if a court fails to adequately assess a defendant's ability to pay. In that case, there's also disparity, and I'd like to take a moment on this. There's another case in this circuit, the Eastern District of Virginia, U.S. v. Diana. That was a case with a similar set of charges, with a similar situated defendant, and what's interesting about that is it was more egregious behavior. It was a longer period of discharging at sea and three port calls in the United States. In that case, the judge imposed a fine of $100,000 per count, only $100,000 per count, and here we have an unwarranted disparity as per U.S. v. Armstrong. We also have the disparity between the two defendants. Remember, there's no distinction between the underlying conduct. In fact, Oceanic is the employer and Ocean Fleet is just a vendor of Oceanic. Your Honor, if I can take just five more seconds. Okay. The sentence is also wrong because it's too broad. It now touches upon the property of third parties not before the court. What am I talking about? Any ship that's managed by Ocean Fleet is barred from coming into the United States until the fine is paid, until all the fines are paid. Oceanic and Ocean Fleet's fines are paid. Oceanic is a third party that operates four or five different ships for four or five different ship owners. Now, that sentence goes too far. It's now impairing the ability of other third parties to operate their business and stay with Ocean Fleet. Now, what's the point of this? You need to wrap it up. I'll reserve it for my rebuttal time. Okay. Let's hear it from the government. Good morning. May it please the Court. Emily Polachek on behalf of the United States with me at council table is the trial attorney, Brendan Selby. The Court should affirm the convictions and sentences in this case. Intentional discharge of oil at sea is an enormous problem that MARPOL and the Act to Prevent Pollution from Ships seek to rectify. There's no dispute in this case that the defendant's ship, the Ocean Hope, illegally discharged oily substances into the water. The only issue here is whether the jury's verdict, finding that the corporate defendants were vicariously liable for these acts, is supported by sufficient evidence. I'm going to address first the issue of vicarious liability, and then if the Court has questions about the sentencing, we can address those. First, Mr. Chalice has said that, I mean, there's no dispute in this case that the crew member, well, specifically Ignacio and Samson, were employees of Oceanic. The dispute is whether or not they were employees of Ocean Fleet. Ocean Fleet, as the manager of the ship, had an agreement with Oceanic. And if you look at the Joint Appendix, page 406, that agreement says that Ocean Fleet agreed to employ, on behalf of the owner, Oceanic, such onboard crew as the manager deems necessary for the proper operation and maintenance of the vessel and to dismiss any or all of them. Therefore, it was Ocean Fleet that was employing the crew that kept the ability to retain or dismiss the employees at Ocean Fleet's discretion. That would indicate that these crew members, Ignacio and Samson, were employees of Ocean Fleet. But even if they weren't employees, they were, at the very least, agents. And the case law recognizes that vicarious liability attaches to either employees or agents. And it's clear in this case, there was plenty of evidence submitted for the jury to find that Ignacio and Samson were working as agents of Ocean Fleet aboard the ship. As Judge King noted, their uniforms bore the name of Ocean Fleet. They requested many of the forms that they were required to fill out. They emailed back and forth with Ocean Fleet, with Ocean Fleet emailing both, emailing to the master and directing that the email be given to the chief engineer, instructions as to what was to take place aboard the ship. So the chief engineer was acting as Ocean Fleet's agent in that engine room. Additionally, all members on board the ship were following Ocean Fleet's own safety management. Was the verdict a general verdict? No, the verdict form was split between the two companies. There was a verdict, there was a guilty verdict form for Oceanic and a guilty for Ocean Fleet. Right, but all the verdicts said it was guilty. I mean, guilty or not guilty? I'm not sure. I would have to submit that. Were there any special interrogatories submitted with it or anything like that? Not that I'm aware of. Okay. So we just, but if it's a general verdict, we'd have to just take evidence in the light most favorable to the government and figure out what they found. Correct. So you had evidence that these were employees of Ocean Fleet? Yes, yes. There was a great deal of evidence submitted. I mean, almost all the crew members testified, the engine room crew members testified. They all testified that they believed that they were employed by Ocean Fleet. And again, looking at the agreement between Ocean Fleet and Oceanic itself, it seems that Ocean Fleet's, you know, voluntarily took on that role of managing the crew. I mean, they were telling them what to do aboard the ship and Chief Engineer Ignacio and Second Engineer Samson were carrying out those instructions aboard the ship. That's the definition of agency. Turning then to whether or not this was within the scope of operations here stem from discharging oil, sludge, and bilge water directly into the ocean, bypassing the pollution control equipment, failing to accurately record those discharges and other necessary events and measurements that needed to be recorded under apps, and lying to investigators and directing their subordinates to do the same. And if we look at Ocean Fleet's manual and the responsibilities that were delegated to each, you can find Chief Engineer's responsibilities at the government's appendix 339 to 40. Second Engineers were at 342. And those included ensuring complete compliance with the various environmental requirements, policies, and procedures, properly maintaining the oil record book, monitoring, managing, and resolving issues associated with proper handling of oily waste, and any responsibilities. The acts that happened fall directly under those responsibilities which Ocean Fleet delegated to Ignacio and Samson as their agents on the ship. I'd also point the court to its decision in automated medical laboratories where the court found that employees at plasma clinics who had been vested with the authority to work as a compliance team for their parent company were acting within the scope of their employment when they directed subordinate employees to falsify and conceal documents that had to be submitted to the FDA. The analogy between the two cases is directly on point. Also, if the court were to look at the Second Circuit's decision in ionium management, in that case the Second Circuit held that the engine crew members who were using a magic hose to bypass pollution control equipment were acting within their authority to maintain the engine room, discharge waste, and record relevant information. Turning then to whether or not this act was for the benefit of the defendants, the defendants benefited in two main ways. They saved time and they saved money. It's undisputed that bilge water and sludge had to be discharged in some way for the ship to continue to reach all the ports along its route. Failure to do so would have cost the defendants time and money. The jury heard significant evidence that the reason that Ignacio and Sampson chose to discharge directly into the ocean were aimed at at least in part satisfying defendants' desire to avoid any kind of complications when the ship came in to do a port state control exam in Wilmington. Do I remember correctly that there were some problems with the functioning of some of the key equipment? Yes. And not using it? Right. Would it give an increase of chances that when they pulled into port it would work fine? Exactly. So they weren't using the oily water separator and the testimony from crew members was that second engineer Sampson told them they were not using it because it was to be safe for surveying once they came into the port state control. So that once they got there it would be functioning and it would be perfect was the testimony. What was the benefit of the business not to have it operating? Well, so that when they came into the port state control and the Coast Guard ran the test there wouldn't have been any malfunction that might have happened by operating the machine during the normal course of business. So that by not using it it was in pristine condition so they were assured that once they got into port it would operate as it was supposed to. What's the benefit of the company of not having it not operating? Not having it. Oh, I'm sorry. Well, dumping the oil in the ocean. What's the benefit of the company? Well, that they're not using their machinery. They're not taking up the time. Is it cheaper for them? Well, it prevents the machine from breaking down. If it's not being used it's not going to break. So it's a financial benefit. Right. And then the other one is that it's time when that is within with respect to the sludge, the oil sludge. So they were directly discharging the sludge into the ocean and there was evidence submitted to the jury that the defendants, the Ocean Hope was running incinerator on a daily basis, which the evidence that was presented to the jury said was unusual and would put a lot of stress on the machinery. And then in fact when they came into the port state control the Coast Guard found that there was a cracked refractory insulation and the Coast Guard testified to the jury that if the refractory is not intact it would cause hot spots, which would cause a safety hazard and you would lose some of your heat through that. And so it's not going to get hot enough to burn the sludge properly. And we saw that there was testimony then that the sludge tank was two-thirds full before they came into port at Wilmington. So they had to get rid of that sludge before they got into Wilmington because Captain Hill testified that having too much sludge aboard can cause a ship to be detained at port until it's offloaded because they don't like sending the ship out with too much sludge aboard. And it, you know, if they're two-thirds full and they're burning every day, clearly something is going wrong. They're not, it's not operating as it's supposed to. So their only other option then would have been to stop and offload that sludge at some facility that is equipped to handle it. Now with respect to the vicarious liability, were there challenges to the instructions that the court gave about liability of the corporations based on the acts of these people? I don't know. I'm not aware of any. I think that the... Did you try the case? I did not. But they, the instructions were agreed upon before they were given. Right. But so you, and you used, you drew on, you cite the Singh case a lot. Exactly. Right. The instructions were drawn from this court's decision in Singh. So, you know, in conclusion, the vicarious liability is appropriate here because Ignacio and Sampson were employees or at the very least agents of both companies. They were acting within the scope of the duties that have been delegated to them by these companies and they acted for the benefit, at least in part for the benefit of the corporate defendants. Now some of those, I'm jumping around here a little bit, but some of the sentencing issues you say are reviewed for plain error. Yes, the defendants did not object. It's paragraph 67 in both of the PSRs is the one that concludes that the defendants are able to pay a fine. And they did not object to that paragraph in the PSR concluding that they were able to pay a fine. And then they didn't present any evidence at the sentencing hearing as to their ability to pay. They never offered... I think there were three sentencing issues and you, two of them you say are plain error review and one you agree they preserved. Right. So ability to pay and then also the grouping, they didn't object to the grouping paragraph. Right. Plain error review. Right. I don't think that they, I mean the issue of disparity in sentences because it was within the court's discretion under 3553 and 3572 to sentence. I don't, I mean disparity didn't really come up in the PSR. So I'm not sure that they had an opportunity to object prior to them actually being sentenced. So I think that falls with under the original normal abusive discretion standard. But this point where they say they're barred from coming back into Wilmington. Any ship that is managed by Ocean Fleet. So a ship can... It mentioned, managed by Ocean Fleet. Was there an objection lodged to that part of the sentence? Do you know of? There wasn't at the sentencing hearing. Well, the question is whether, what's the standard of review? He's complained about it. They are complaining about it now. What's our standard of review for it? We presented it as abusive discretion. Pardon? We presented it as abusive discretion with respect to that, the probation conditions. But I point out that Mr. Charles is talking about these third parties that can't come into port. Those parties, and he does not have standing to challenge that probation condition as the third parties. He could challenge the condition as the Ocean Fleet and Oceanic, but not these other ships that are coming in port. Those ships can certainly come into a U.S. port by simply hiring a different management company. And the court concluded that by excluding Ocean Fleet from coming into port after it has had a violation like this is certainly within... It's related to the offense and would serve as a punishment and deterrence. You didn't fine them a lot of money and you put them on an installment plan. Right. Although they are allowed to... They can pay that if they wanted to pay it all at once. The court said that they are only barred insofar as they haven't paid the fines yet. So if they were to pay them off, they could come into port. If they pay when it amounts for due, they can come in. Right. And also, the court also told them and says in the sentencing hearing that if conditions change, recognizing that the market was unstable at the time of sentencing, if conditions were to change, they were welcome to bring that information to the probation office for a reassessment of their ability to pay. So the court did recognize that, you know, things can happen. Unless there are further questions? I think we understand your position. Thank you very much. Thank you. Charles? Thank you, Your Honors. The court's asked about the challenge to the ability to pay. The PSR has made no mention of any quantum. And in fact, Your Honors will know that the discussion with the probation office and the court was that there was a $500,000 bond posted jointly and severally on hand to pay a fine. So without having a crystal ball, it would be how do you challenge the ability to pay? There was $500,000 that had been posted by a joint and several bond. So there was no other challenge to present at that point in time until the number came out. The number only came out at sentencing was, wait, there's no way they can pay that. Now, the government comes up here and offers evidence of what some Coast Guard agent says about saving time and money. But that's not the perspective of what the law requires. The law requires a look at the subjective intent of the actor. And there's not one single crew member who said that he believed he was acting at least in part to benefit either Oceanicus employer or Ocean Fleet. Not one. I'll point to the joint appendix. Can I ask a question about that? I mean, in intent cases, you don't often get that kind of direct evidence, right? Don't we usually say juries can infer that from circumstantial evidence? I think you can. The fact that they didn't admit to the crime isn't really positive, right? But there was no evidence of subjective intent. The evidence of their intent. Nothing from which a jury could infer that. That's correct. It's complete insufficiency of evidence. The actual evidence was to the opposite. It was affirmative evidence from the crew members recognizing their training, recognizing their reporting requirements, recognizing their promise to refuse any illegal order. And more important than that, recognizing that if they got caught by the captain or some other third party that would come on board the ship, that they would lose their job. It was no benefit. It was a detriment. Everyone knew it was a detriment to the company because it prevented Oceanic or anyone else similarly situated like Ocean Fleet to coming in and taking corrective measures before arrival in U.S. waters. I'd like to point the court to the joint appendix at page 146. Minente, third engineer, says he testified he worked for Oceanic. Joint appendix 190. Beliza testified he worked for Oceanic PERS contract. Page 194. More testimony from Beliza about working for Oceanic. The oiler, Clark Villar, joint appendix page 209. He worked for Oceanic as per contract. Joint appendix page 312. Captain Yara, the crew's manning agent who came from Manila, testified that InterOrient as a manning agency sources crew for the ship owner, Oceanic. And all the contracts that are in the record also make that clear. The government said that Ocean Fleet hired the crew. But what they said and what very quickly was on behalf of Oceanic. They were serving in a role as an intermediary, but weren't a principal in the employer-employee relationship. They pointed to emails. But that same email that we're talking about, daily noon reports, went to the ship owner, went to the ship manager, went to the ship charterer, went to the cargo owner, and went to the cargo receiver. That's not evidence of an employment or an agency relationship. Judge King asked about what was the benefit to the business. There is no benefit to the business. Let's remember, this ship had not one, not two, but a dozen mechanics working on board at all times to use that pollution prevention equipment. Twelve people. Why do you pay for twelve mechanics? Do you have a mechanic on call at your house for your car? Of course not. But this business has twelve of them to handle one engine and associated machinery to do the job properly. But the jury was properly instructed on that question. They were properly instructed on that question, Your Honor, but they weren't properly instructed on what is an agent? What is an employer? What is an employee? You don't bring any issues up here about instructions? I don't see any. I haven't seen any. No, Your Honor. As I recall, there was a series of charging conferences in chambers, and there were objections to the charge, but not on that point.  There was not an appeal about the instruction. No, Your Honor. It was properly instructed on these points. I agree with that, Your Honor. General verdict. Yes, sir. I agree with that statement. Is guilty. So the question is whether the evidence is sufficient to support the guilty verdict as to each of the defendants, as to each count. We have to look at each. We have to look at them individually for sure. I agree with that, Your Honor. But again, the subjective belief or the subjectivity of who someone may be, doesn't trump the actual employment contract relationship. Final point. Government cites the USV automated laboratories. That was a case where the employer of the employees was vicariously liable. Not some third party. The employer. And in that case, there was four counts to which the court sentenced the company to $250. $250 per count for a whopping fine of $1,000. That underscores the unreasonableness of the $2.7 million. You don't claim that the fine violates the Eighth Amendment or anything, do you? I claim it's unreasonable. What's the standard of review when we look at the amount of the fine? Is it abuse of discretion? I think the government thinks it is. I believe that's correct. Okay. All right. Thank you very much, Mr. Federalist. We'll ask the clerk to adjourn court and then we'll come down and recounsel.
judges: William B. Traxler Jr., Robert B. King, Pamela A. Harris